Timothy T. **SHERWIN** and Jannice M. Sherwin, Plaintiffs,

v.

**INDIANAPOLIS COLTS, INC., K. Donald Shelbourne, M.D. and Arthur Rettig, M.D., Defendants.**

No. 90–CV–753.

United States District Court,
N.D. New York.

Dec. 8, 1990.

---

O'Connell and Aronowitz, Thomas J. Di Novo and James E. Patrick, of counsel, Albany, N.Y., for plaintiffs.

Whiteman Osterman & Hanna, Michael Whiteman, Margaret J. Gillis and Kathryn Girardat Hart, of counsel, Albany, N.Y., for defendants Indianapolis Colts.

Thorn and Gershon, Paul J. Catone, of counsel, Albany, N.Y., for defendants Shelbourne and Rettig.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

### I. *Introduction*

This action is brought by Timothy Sherwin, formerly a professional football player for the Indianapolis Colts ("Colts"), and his wife, Jannice Sherwin. Timothy Sherwin alleges that, while he was under contract to the Colts, he suffered an injury for which the Colts and their team doctors, defendants K. Donald Shelbourne and Arthur Rettig, failed to provide adequate medical care, and that the defendants intentionally withheld information regarding the true nature of his injury. Timothy Sherwin asserts various causes of action against the Colts and defendants Shelbourne and Rettig sounding in breach of contract, negligence, medical malpractice, fraud, negligent misrepresentation, and negligent and intentional infliction of emotional distress.[1] Jannice Sherwin asserts a cause of action for loss of consortium.

The Colts move to dismiss the complaint, contending that all of Timothy Sherwin's claims arise out of his player agreement with the team and the collective bargaining agreement between the National Football League Players Association ("NFLPA")

---

1. Plaintiff's "First Claim for Relief" in the complaint alleged a breach of contract by the defendant Indianapolis Colts. That claim has now been dismissed on consent of the parties.

and the National Football League Management Council, and must be arbitrated pursuant to the provisions of those agreements. The Colts also maintain that Jannice Sherwin's claims are derivative of her husband's, and that the court should stay litigation of those claims until resolution of Timothy Sherwin's causes of action.

Defendants Shelbourne and Rettig move to dismiss the complaint as to them for lack of personal jurisdiction. The doctors contend that New York jurisdiction cannot be exercised over them because they do not have sufficient contacts with the State of New York and plaintiffs' claims are not related to the minimum contacts they may have with New York. Oral argument on the motions was heard on November 6, 1990.

## II. *Background*

Timothy Sherwin (hereinafter "plaintiff" or "Sherwin"), was employed by the Colts as a professional football player for the 1988 football season. Prior to the commencement of the football season, the plaintiff underwent and passed a physical examination conducted by team physicians. Complaint, ¶¶ 17–18. The plaintiff alleges that sometime in July 1988, he suffered a neck injury during a practice session which caused immediate numbness and tingling in his arms, hands, hips, and lower extremities. Complaint, ¶¶ 19–20. He reported his injury to the team trainers and/or physicians, and X-rays were taken. According to the plaintiff, team representatives and the team physicians refused to discuss the nature of his injury with him, despite his requests to obtain his x-ray results. Complaint, ¶¶ 21–23.

Plaintiff continued to participate in practice sessions despite continued pain in his neck, cervical area and thoracic spine through late July 1988 and into August 1988. Complaint, ¶ 25. Plaintiff claims that he continued to practice because he was informed, by team representatives and/or the team physicians, "that there was nothing to worry about." Complaint, ¶ 29.

In August 1988, the plaintiff was traded by the Colts to the New York Giants ("Giants"). Complaint, ¶ 30. During his first physical contact in a practice session with the Giants, the plaintiff alleges that he again experienced numbness and tingling in his extremities. During plaintiff's first regular season football game with the Giants, he alleges his extremities became numb, causing him to fall to the ground. Complaint, ¶¶ 33–34. Plaintiff was then examined by trainers and team physicians for the Giants, who determined that he was suffering from a severely herniated disc in his spine which required surgery. The injury allegedly ended plaintiff's football career. Complaint, ¶¶ 35, 49.

Pursuant to his employment with the Colts, plaintiff entered into a standard player agreement used for all players, as required by the collective bargaining agreement between the NFLPA and the NFL Management Council (the "CBA").

Paragraph 9 of the player agreement provided, in part, that:

> [i]f Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and, in accordance with Club's practice, will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period, as Player is physically unable to perform the services required of him by this contract because of such injury....

With respect to player injuries, the CBA provided, in pertinent part:

> If a Club physician advises a coach or other Club representative of a player's physical condition which could adversely affect the player's performance or health, the physician will also advise the player....

CBA, Article XXXI, section 1.[2]

Both the player contract and the CBA provide for arbitration of disputes arising un-

---

**2.** The 1982 Collective Bargaining Agreement ex-    pired by its terms in August 1987, and no new

der the agreements. Paragraph 20 of the player agreement states:

> Any dispute between Player and Club involving the interpretation or application of any provision of this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs. If no collective bargaining agreement is in existence at such time, the dispute will be submitted within a reasonable time to the League Commissioner for final and binding arbitration by him, except as provided otherwise in Paragraph 13 of this contract.

Article VII, section 1 of the CBA provides:

> Any dispute (hereinafter referred to as a "grievance") involving the interpretation or application of, or compliance with, any provision of this Agreement, the Standard Player Contract, the NFL Player Contract, and any provision of the NFL Constitution and Bylaws, pertaining to terms and conditions of employment of NFL players will be resolved exclusively in accordance with the procedure set forth in this Article....[3]

Article VII, section 2 of the CBA requires that a grievance be initiated within 45 days "from the date of the occurrence or non-occurrence upon which the grievance is based, or within 45 days from the date on which the facts of the matter became known or reasonably should have been known to the party initiating the grievance." The plaintiff never initiated a

grievance against the Colts with respect to his injury.

The Colts now move to dismiss the complaint against them under Fed.R.Civ.P. 12(b) for lack of subject matter jurisdiction. The Colts contend that their duty to provide medical care to the plaintiff arises exclusively out of the player contract and the CBA, and that any claims arising out of that duty therefore necessarily require interpretation of those agreements. Consequently, the Colts argue, plaintiff's claims are subject to the mandatory grievance and arbitration procedures contained in the agreements. The Colts move, in the alternative, to stay this litigation pending arbitration of the plaintiff's claims.

The plaintiff argues, on the other hand, that his claims, other than the breach of contract claim which has been dismissed, are based in tort, and are thus outside the scope of the agreements. Resolution of these claims does not require interpretation of the contracts, the plaintiff contends, and the claims are therefore not subject to arbitration. The issue presented is not whether medical treatment was provided, the plaintiff argues, but the quality of the medical care provided and the defendants' intentional withholding of information regarding the nature of his injury.

Defendants Shelbourne and Rettig move to dismiss under Rule 12(b) on an entirely different ground—lack of personal jurisdiction. These two defendants are medical doctors, under contract to the Colts to provide services as team physicians. They are

---

CBA has yet been reached. The Colts argue, however, and the plaintiff does not dispute, that the 1982 CBA continues to govern the relationship of the parties at least with respect to arbitration since the parties have continued to honor and utilize the arbitration provisions of the 1982 CBA. *See Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionary Workers Union,* 430 U.S. 243, 252–54, 97 S.Ct. 1067, 1072–73, 51 L.Ed.2d 300 (1977) (if parties to collective bargaining agreement continue to abide by its arbitration terms, duty to arbitrate continues despite expiration of agreement); *Doleman v. Minnesota Vikings Football Club, Inc.,* Docket No. 90–2315 (D.Ct.Hennepin County, MN, February 12, 1990); Affidavit of Robert J. Terpening, Jr., dated August 23, 1990, ¶ 6.

3. The CBA also provides, in a separate article, for the filing of an "injury grievance," defined as follows:

> An "injury grievance" is a claim or complaint that, at the time a NFL player's Standard Player Contract or NFL Player Contract *was terminated by a club,* the player was physically unable to perform the services required of him by that contract because of an injury incurred in the performance of his services under that contract ... (emphasis added).

The Colts contend, and the plaintiff does not dispute, that this grievance provision would not apply to the plaintiff, because his contract was not *terminated* by the Colts, but that he was traded to another club, which then terminated his contract.

residents of the State of Indiana, and their medical practices are located in Indianapolis. Although the doctors travel once a year to the State of New York, when the Colts play the Buffalo Bills, they contend they do not have sufficient contacts with New York to be subject to long-arm jurisdiction. Shelbourne and Rettig also argue that plaintiff's claims are unrelated to the minimal contacts that may be established by their annual visit to Buffalo, and thus jurisdiction is not conferred under the "single contact" rule in New York CPLR § 302(a)(1).

Plaintiff argues that the activities of defendants Shelbourne and Rettig in New York are sufficient to satisfy the "doing business" requirement for jurisdiction under CPLR § 301. Plaintiff also contends that both transact business in and have contracted to supply goods or services in the state, as required by CPLR § 302(a)(1). In addition, plaintiff claims that his causes of action based on the quality of the medical care provided him are sufficiently related to Shelbourne's and Rettig's performance of medical services in New York to establish the necessary nexus for the exercise of long-arm jurisdiction. The Colts' motion to dismiss and defendants Shelbourne's and Rettig's motion to dismiss will be addressed in order.

### III. *Discussion*

#### A. Are Plaintiff's Claims Against the Colts Subject to Arbitration?

The Colts argue that, although plaintiff pleads his claims as state-law tort claims, they must be treated as federal labor law claims under section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), since resolution of the claims is substantially dependent upon interpretation of the CBA. The Colts maintain that, if the claims are encompassed by section 301(a), the plaintiff is required to arbitrate them under the terms of the CBA. Section 301(a) provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

The effect of section 301(a) was not only to provide federal court jurisdiction over controversies involving collective bargaining agreements, but to " 'authorize[ ] federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements.' " *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 403, 108 S.Ct. 1877, 1880, 100 L.Ed.2d 410 (1988) (quoting *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 451, 77 S.Ct. 912, 915, 1 L.Ed.2d 972 (1957)). As the Court in *Lingle* observed, section 301 "mandated resort to federal rules of law in order to ensure uniform interpretation of collective-bargaining agreements, and thus to promote the peaceable, consistent resolution of labor-management disputes." *Lingle,* 486 U.S. at 404, 108 S.Ct. at 1880 (citing *Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962)).[4] Thus,

---

**4.** The Court in *Lucas Flour* specified why the meaning given to terms in collective bargaining agreements must be determined by federal law:

> [T]he subject matter of § 301(a) "is peculiarly one that calls for uniform law." ... The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provi-

sions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract. Once the collective bargain was made, the possibility of conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to its interpretation ... [and] might substantially impede the parties' willingness to agree to contract terms providing for final arbitral or judicial resolution of disputes.

*Id.* 369 U.S. at 103–04, 82 S.Ct. at 576–77 (footnote omitted).

state law is "pre-empted" by section 301 in that only the federal law fashioned by the courts under section 301 governs the interpretation and application of collective bargaining agreements. *United Steelworkers of America v. Rawson*, — U.S. —, —, 110 S.Ct. 1904, 1909, 109 L.Ed.2d 362 (1990).

The Supreme Court has also determined that to give full weight to the policies underlying section 301(a), its preemptive effect must extend beyond suits alleging contract violations to those relabeling their contract claims as tort claims. Thus, the Court held in *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, the claim must either be treated as a § 301(a) claim (citation omitted) or dismissed as pre-empted by federal labor-contract law." *Id.* at 220, 105 S.Ct. at 1916. The test to be used in applying *Allis–Chalmers* is to determine if "the *duty to the employee* of which the tort is a violation is created by a collective-bargaining agreement and *without existence independent of the agreement.*" *United Steelworkers of America v. Rawson*, — U.S. —, —, 110 S.Ct. 1904, 1909, 109 L.Ed.2d 362 (1990) (citing *Allis–Chalmers*, 471 U.S. at 211, 105 S.Ct. at 1911) (emphasis added). In order to be independent of the collective bargaining agreement, the *Rawson* Court indicated, a tort claim must allege a violation of a duty "owed to every person in society," as opposed to a duty owed only to employees covered by the collective bargaining agreement. *Id.*

■ The Court in *Allis–Chalmers* also noted, however, that not every dispute concerning employment, or "tangentially involving a provision of a collective-bargaining agreement," is pre-empted by section 301. *Id.* 471 U.S. at 211, 105 S.Ct. at 1911.

A claim is independent of the collective bargaining agreement, and may thus be considered under state law, if its resolution does not require interpretation of the collective bargaining agreement. *Lingle*, 486 U.S. at 407, 108 S.Ct. at 1882.

■ If a claim is identified as a section 301 claim, it is subject to the arbitration provisions, if any, of the collective bargaining agreement. *Allis–Chalmers*, 471 U.S. at 219–20, 105 S.Ct. at 1915. It is settled in the field of federal labor law that an employee must at least attempt to exhaust the grievance and arbitration procedures established by the collective bargaining agreement before bringing suit. *Vaca v. Sipes*, 386 U.S. 171, 184, 87 S.Ct. 903, 913, 17 L.Ed.2d 842 (1967). As the Supreme Court cautioned in *Allis–Chalmers*, "[a] rule that permitted an individual to sidestep available grievance procedures [by labeling his or her claims as tort claims] would cause arbitration to lose most of its effectiveness." *Id.* 471 U.S. at 220, 105 S.Ct. at 1915.[5]

Thus, the court must determine here whether Sherwin's claims are substantially related to the provisions of the CBA, or independent of it. If they are not independent of the CBA, then his claims must be dismissed for his failure to at least attempt to exhaust his grievance and arbitration procedures.

■ Although the Colts in their motion papers treat the obligations contained in the CBA and in the standard player agreement independently, for the purposes of this analysis they may be considered together. The standard player agreement, which is used for every NFL player as required by Article XII, section 1 of the CBA, is effectively incorporated by reference in that article. The question then, under *Allis–Chalmers* and its progeny, is whether the duty or duties plaintiff claims were breached by the Colts arise out of the

---

5. It is appropriate to note here that the Colts commenced a grievance against plaintiff Sherwin pursuant to section 20 of the player agreement and Article VII of the CBA on July 25, 1990, based upon this lawsuit and Sherwin's apparent failure to initiate arbitration of the claims asserted here. *See* Memorandum of Law in Support of Defendant Indianapolis Colts, Inc.'s Motion to Dismiss, p. 5. The Colts also commenced an action in Indiana state court to compel arbitration of Sherwin's claims. *Id.*

CBA and the player agreement, or if they may be resolved without interpretation of, and are thus independent of, the agreements. The answer to that query is that the duties arise out of the agreements, and plaintiff's state-law claims are therefore "pre-empted" by section 301(a).

Plaintiff's causes of action against the Colts, excluding the breach of contract claim which is now dismissed, may be condensed as follows:

1. That the Colts, "by and through its team physicians, trainers, agents, servants and/or employees has knowingly committed a fraud upon the Plaintiff ... by intentionally and willfully withholding the true nature and extent of his injuries from him, and by misrepresenting to the Plaintiff ... that he was in satisfactory condition to continue to play." Complaint, ¶ 50.

2. That the Colts were *"under a duty to provide its players, including the Plaintiff herein, with appropriate and necessary care, attention and treatment if injured,"* and that the Colts negligently failed to provide such care and treatment and negligently failed to disclose to plaintiff his true medical condition. Complaint, ¶ 55–59 (emphasis added).

3. Negligent infliction of emotional distress. Complaint, ¶ 103–04.

4. Intentional infliction of emotional distress. Complaint, ¶ 108–10.

It is clear that plaintiff's claims are "substantially dependent" upon analysis of the agreements and must be treated as section 301(a) claims under *Allis–Chalmers*. The

Colts did not owe a duty to provide medical care to the plaintiff independent of the relationship established in the agreements. The court cannot resolve plaintiff's claims based on inadequate medical care without interpreting the clauses establishing those duties in the agreements. In addition, the court cannot resolve plaintiff's fraud and negligent misrepresentation claims without reference to Article XXXI, section 1 of the CBA, which establishes the duty of a club physician, and arguably the club, to inform a player of physical conditions "which could adversely affect the player's performance or health." [6] Moreover, the Colts' duties are not those that would be "owed to every person in society," as *Rawson* seems to require to establish independence from the collective bargaining agreement. The Colts owed a duty to provide adequate medical care, or to provide truthful information regarding medical treatment and diagnoses, only to their players covered by the standard player agreement and the CBA.

Plaintiff's claims for negligent and intentional infliction of emotional distress also arise out of the CBA, in that they are derived from the same circumstances and obligations underlying the other claims. *See e.g.*, *Newberry v. Pacific Racing Ass'n.*, 854 F.2d 1142, 1149–50 (9th Cir. 1988). The plaintiff cites in support of his position two arbitration decisions involving NFL players, which he contends stand for the proposition that tort claims brought by players against professional football clubs are not properly subject to arbitration. *In re An Arbitration Between National*

---

**6.** Plaintiff's counsel contends that Article XXXI, section 1, only establishes a duty of disclosure on behalf of the team physician, and not the club. This, however, is precisely the type of question which must be reserved for the arbitrator. The court's function in reviewing a collective bargaining agreement is "strictly confined" to determining whether the parties have agreed to arbitrate a certain type of dispute. *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). As stated by the Supreme Court in another of the "Steelworkers Trilogy" cases:

[The court] is confined to ascertaining whether the party seeking arbitration is making a

claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator.... The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, *or determining whether there is particular language in the written instrument which will support the claim....*

*United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960) (emphasis added).

Football League Mgt. Council and the Miami Dolphins and National Football League and Thomas Henderson (hereinafter "Henderson"); In re An Arbitration Between the NFLPA on Behalf of Gregory Sampson and the National Football League Mgt. Council on Behalf of the Houston Oilers (hereinafter "Sampson"). In Henderson, the arbitrator stated that the question of whether a team physician's discharge of the player from his supervision was "negligence" was a question of Florida law "not properly addressed in this forum." The plaintiff also chooses a passage from Sampson in which the arbitrator stated that a question of misdiagnosis or malpractice by a team physician "is not properly addressed in the forum of this Collective Bargaining Agreement." These decisions are, of course, not binding on the court, and they are also convincingly distinguished by the Colts. The Colts point out in their reply memorandum of law that the question presented to both arbitrators was negligence on the part of the team physicians, not the teams. As the arbitrator stated in Sampson, "if there was a contention on the part of Sampson that the doctors ... did not perform according to some 'standard,' the action clearly must be against them, not against the Oilers. The record is again uncontradicted that those doctors are not Employees or in an agency relationship with the Houston Oilers, but are in fact independent contractors." (emphasis added). The arbitrator concluded that whatever complaint Sampson had with respect to negligence involving his medical treatment could be brought solely against the doctors, not against the team, which the arbitrator found had performed its obligations to provide medical care up to the standards required in its agreements with the player.

The plaintiff here also contends that, in the Second Circuit, a tort claim is not subject to arbitration "absent a clear, explicit statement in the Collective Bargaining Agreement directing an arbitrator to hear and determine the validity of tort damage claims," citing Old Dutch Farms, Inc. v. Milk Drivers and Dairy Employees Local Union No. 584, 359 F.2d 598 (2d Cir.), cert. denied, 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 (1966). That holding in Old Dutch Farms is not incongruous, however, with a finding here that resolution of plaintiff's claims requires interpretation of the collective bargaining agreement by an arbitrator.

By reason of the foregoing, the court concludes that plaintiff's causes of action are "substantially dependent" upon the collective bargaining agreement, and are thus claims under section 301(a) that are subject to arbitration. The claims are therefore dismissed. Jannice Sherwin's derivative claim for loss of consortium is stayed pending arbitration.

**B. Is There Personal Jurisdiction Over Defendants Shelbourne and Rettig?**

Defendants Shelbourne and Rettig move to dismiss the complaint as to them for lack of personal jurisdiction pursuant to Rule 12(b). Shelbourne and Rettig have provided medical services to the Colts pursuant to a series of one-year contracts. Shelbourne has been a team physician since 1984, and Rettig has been a team physician since 1986. Under the terms of their agreements with the Colts, the doctors are not agents or employees of the Colts, but work as independent contractors. Team Physicians Agreement, ¶ 5.2.[7]

---

7. Paragraph 5.2 of the Team Physicians Agreement states:

> No Partnership. This Agreement shall not be deemed to create the relationship of partners, joint venturers, or employer or employee, between the parties hereto, each of which shall remain an independent contractor in its performance hereunder. Team Physicians agree that they shall have no power, right or obligation to bind Colts in any manner whatsoever, and none of the parties shall be liable to any third party in any way for any engage-

ment, obligation, contract, representation or transaction of any other party hereto, or for the negligent act or omission to act of any party hereto.

Although the plaintiff alleges in the complaint that Shelbourne and Rettig are employees of the Colts, he has not disputed since that the doctors perform only as independent contractors for the Colts. Thus, the issue of personal jurisdiction over the doctors will be determined independently from that of the Colts.

Shelbourne and Rettig are licensed to practice medicine in the State of Indiana. Neither is licensed nor has ever been licensed in the State of New York. Affidavit of K. Donald Shelbourne, M.D., dated September 10, 1990, ¶ 2; Affidavit of Arthur C. Rettig, M.D., dated September 10, 1990, ¶ 2. Both doctors maintain offices for the practice of medicine in the City of Indianapolis; neither has an office in New York. Shelbourne Affidavit, ¶ 3; Rettig Affidavit, ¶ 3. The contracts for the doctors' services have been executed in Indiana. Shelbourne Affidavit, ¶ 10; Rettig Affidavit, ¶ 10.

The doctors' only contacts with New York are annual trips to Buffalo when the Colts play the Buffalo Bills. According to their affidavits, the doctors have only performed medical services for Colts team members while in New York, and did not perform any medical services for the plaintiff while in New York. The doctors contend that their contacts to New York are not sufficient to establish personal jurisdiction over them, and that the plaintiff's claims are not related to the minimum contacts they do have with New York.

The plaintiff argues that Shelbourne and Rettig maintain sufficient contacts with New York to be "present" in New York for purposes of personal jurisdiction under CPLR § 301. The plaintiff also contends that Shelbourne and Rettig have transacted business within New York, and have contracted outside the state to supply services within the state, conferring personal jurisdiction under CPLR § 302(a). As examples of Shelbourne's and Rettig's connections to New York, plaintiff notes that the physicians are required to organize and coordinate medical services with a team of referral physicians, dentists and surgeons to treat Colts players at all away games, including the games in Buffalo (Team Physicians Agreements, ¶¶ 1.2 and 1.3(c)); that in the 1989 Team Physicians Agreement, the doctors were required to obtain additional medical malpractice insurance to cover services rendered to Colts players outside the State of Indiana, including in New York (1989 Team Physicians Agreements, ¶ 4.1); and that the doctors derive revenue from performing services in New York, in that they receive a fixed seasonal fee for their services broken down into weekly fees.

In order to be subject to jurisdiction under CPLR § 301, the defendants must be "doing business" in New York, as established by their contacts to the state. A defendant "is . . . present in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contacts, if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.'" *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir.1985) (quoting *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917)); *see also Laufer v. Ostrow*, 55 N.Y.2d 305, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982). It is hard to imagine how Shelbourne's and Rettig's contacts to New York could be more occasional or casual. They appear in New York once a year, and do not solicit business from or do business with New York residents nor come into contact with any New Yorkers other than the Buffalo Bills' medical staff or the staff of local hospitals. The doctors are not "doing business" in New York, and therefore are not "present" for purposes of jurisdiction under CPLR § 301.

In addition, there is some question whether jurisdiction may be had over an individual, as opposed to a corporation, under CPLR § 301, if there is not some nexus between the individual's activities in New York and the plaintiff's claims. In *ABCKO Indus., Inc. v. Lennon*, 52 A.D.2d 435, 384 N.Y.S.2d 781 (1st Dep't 1976), the court held that where jurisdiction over an individual is obtained under CPLR § 301 because the individual is "doing business" within the state on a continuing basis, jurisdiction will also attach to causes of action that did not arise in New York. *Id.* at 440, 384 N.Y.S.2d 784. *ABCKO* involved a suit by a theatrical management company to recover moneys loaned to former members of the Beatles and their related record companies. However, the Second Department, Appellate Division, later questioned *ABCKO*'s broad application of CPLR

§ 301, and stated that, even if it was correctly decided, "it appears that that case has no application to cases ... where the cause of action asserted against one who is allegedly 'doing business' in the state is not commercial in nature." *Nilsa B.B. v. Clyde Blackwell H.*, 84 A.D.2d 295, 306, 445 N.Y.S.2d 579, 587 (2d Dep't 1981).

■ Plaintiff also contends that jurisdiction may be exercised under CPLR § 302(a)(1), which provides:

> (a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent:
>
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state....

It is clear from the language of CPLR § 302(a)(1) that it is not sufficient that the defendant has either transacted business or contracted to supply goods or services in the state; it is also required that the plaintiff's cause of action *arise* from that act. *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321, 323 (1981). The plaintiff must accordingly establish some "articulable nexus" between the business transacted and the cause of action sued upon. *Id.*

The plaintiff argues that the business transacted, or the services supplied, by the doctors in New York were part of their medical practice. Plaintiff asserts that his claims arise out of the doctors' practice of medicine, and therefore satisfy the jurisdictional requirements of section 302(a)(1). The plaintiff relies heavily on *Wurtenberger v. Cunard Line Ltd.*, 370 F.Supp. 342 (S.D.N.Y.1974), in which a cruise ship's physician who was not a resident of New York, and who was sued for medical malpractice for incidents which did not occur in New York, was nevertheless found to be subject to personal jurisdiction under CPLR § 302(a)(1). The court found prelim-

inarily that the physician had "transacted business" within the state since, although he was not licensed to practice medicine in New York and claimed to have only been in New York on four occasions, he was a member of the ship's crew when it departed New York and when it returned to New York, and presumably practiced medicine while the ship was in New York waters. *Id.* at 344. With respect to the "nexus" requirement of section 302(a)(1), the court determined that the physician was present on the ship when passengers boarded in New York, and effectively held himself out as a qualified doctor who would treat medical problems on the cruise. Thus, some of the ship's passengers, many of whom were foreseeably New York residents, decided to forego other medical services while at sea in reliance on the physician's competence. *Id.* at 345. The court reasoned that "[t]he alleged subsequent malpractice in the course of the cruise, therefore, while it did not occur in New York, may be said to have arisen out of [the doctor's] 'transaction of business' in New York." *Id.*

*Wurtenberger* is distinguishable from the instant case. The plaintiff here was presumably a resident of Indiana who received treatment from the defendant physicians in Indiana.[8] The doctors did not, while in New York, represent to New York residents, including the plaintiff, that they were competent physicians available to perform medical services for them. Moreover, the plaintiff was not a passenger on the Colts' "cruise" to Buffalo in the year he was injured. His injury occurred, and was treated, in Indiana. He was traded before the regular playing season began.

*Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55 (2d Cir.1985), on which plaintiff also relies, is easily distinguishable. In *Hoffritz*, the plaintiff corporation's cause of action arose out of the breach of a franchise agreement which was entered into outside of New York and breached outside of New York. However,

---

**8.** There was some discussion during oral argument about Sherwin possibly being a New York resident at the time of his injury. However, there is nothing in the record to indicate that he

was not a resident of Indiana, where he had been a football player for approximately eight years.

the court found that meetings in New York between representatives for the plaintiff and defendant at "frequent intervals over approximately a ten-year period" at which franchise business was discussed established the necessary nexus for jurisdiction. The situation in *Hoffritz* is not similar to the circumstances presented here.

Plaintiff's causes of action must be directly and proximately related to the business transacted in New York in order to provide a basis for section 302(a)(1) jurisdiction. Conversely, a cause of action which bears only a remote and indirect relationship to the New York transaction will not support jurisdiction. *Rene Boas & Assoc. v. Vernier*, 22 A.D.2d 561, 257 N.Y.S.2d 487 (1st Dep't 1965). Plaintiff's claims are not remotely related to the doctors' activities in New York.

Although it is unnecessary to decide this point since plaintiff's claims do not bear a relationship to the doctors' activities in New York, it could also be argued that the doctors did not transact business or supply services in Buffalo. As previously stated, the doctors have no contact with New Yorkers while in Buffalo, other than with Buffalo Bills' medical staff to coordinate their services. Their purpose for being in New York is not to solicit or transact business, but to provide services to members of the Colts, which have already been contracted for in Indiana.

### Conclusion

The motion by defendant Indianapolis Colts to dismiss plaintiff Timothy Sherwin's claims for lack of subject matter jurisdiction is granted. Litigation of plaintiff Jannice Sherwin's claim for loss of consortium is stayed pending arbitration. The motion by defendants Shelbourne and Rettig to dismiss for lack of personal jurisdiction is granted.

IT IS SO ORDERED.