PATRICK JEFFERS, Plaintiff v. DONALD F. D'ALESSANDRO, M.D., THE MILLER ORTHOPAEDIC CLINIC, INC., RICHARDSON SPORTS LIMITED PARTNERSHIP d/b/a CAROLINA PANTHERS, and PFF, INC., Defendants

No. COA08-813

(Filed 18 August 2009)

**1. Appeal and Error— law of the case—prior interlocutory appeal**

The law of the case doctrine did not preclude a challenge to an order compelling arbitration where a prior appeal had been deemed interlocutory with no substantial right involved. That decision necessarily did not resolve the issue presented here: whether the trial court erred in compelling arbitration.

**2. Contracts— collective bargaining—professional football— medical treatment—state claims preempted**

The trial court did not err by determining that a professional football player's claims involving medical treatment were preempted by the Labor Management Relations Act (LMRA). Plaintiff's claims are substantially dependent upon analysis of the NFL Collective Bargaining Agreement and the player's contract, and those claims are therefore preempted by Section 301 of the LMRA.

**3. Arbitration and Mediation— arbitration—professional football player—medical treatment—collective bargaining agreement**

The trial court properly granted a motion to compel arbitration of claims by a professional football player arising from medical treatment. The NFL's collective bargaining agreement provided for arbitration of any dispute involving the interpretation of, application of, or compliance with the agreement or contract; these claims concern the interpretation or application of the agreement's medical rights provisions, and are subject to arbitration.

Appeal by plaintiff from order entered 1 April 2004 by Judge Robert C. Ervin and judgment entered 27 March 2008 by Judge Albert Diaz in Mecklenburg County Superior Court. Heard in the Court of Appeals 29 January 2009.

JEFFERS v. D'ALESSANDRO

[199 N.C. App. 86 (2009)]

*Lewis A. Cheek; and Allen, Moore & Rogers, L.L.P., by John C. Rogers, III, for plaintiff-appellant.*

*Cranfill Sumner & Hartzog LLP, by Samuel H. Poole, Jr. and Jaye E. Bingham; and Robinson, Bradshaw & Hinson, P.A., by Mark W. Merritt, for defendants-appellees Richardson Sports Limited Partnership and PFF, Inc.*

GEER, Judge.

Plaintiff Patrick Jeffers appeals from the trial court's order compelling arbitration and the court's subsequent judgment confirming the arbitrator's award dismissing his claim against defendants Richardson Sports Limited Partnership and PFF, Inc. (collectively "the Carolina Panthers"). It is undisputed that Jeffers, a former player for the Carolina Panthers, was subject to the NFL Collective Bargaining Agreement (the "CBA") entered into by the NFL Management Council and the NFL Players Association. The primary issue at the trial level was, and on appeal is, whether Jeffers' claims—arising out of surgery on his knees by the Carolina Panthers' team physician—are preempted by Section 301 of the Labor Management Relations Act ("LMRA"). We agree with the trial court that resolution of Jeffers' claims substantially depends upon analyzing the CBA and, therefore, Jeffers' claims are preempted. Further, the trial court properly determined that, assuming Jeffers' complaint stated a Section 301 claim for breach of the CBA, he was required to arbitrate that claim. We, therefore, affirm.

## Facts and Procedural History

On 22 April 1999, Jeffers, an NFL wide receiver, was acquired by the Carolina Panthers as a restricted free agent. Jeffers signed a one-year standard player's contract, negotiated between the NFL Management Council, which represents all NFL teams, and the NFL Players Association, the exclusive bargaining representative of all present and future NFL players. The player's contract incorporates by reference the CBA, which, in turn, "represents the complete understanding of the parties on all subjects covered herein . . . ." Article XLIV of the CBA sets out the "Players' Rights to Medical Care and Treatment."

Jeffers was injured during a 2000 preseason game, tearing his right anterior cruciate ligament ("ACL"). He agreed to allow the Carolina Panthers' team physicians, Dr. Donald F. D'Alessandro and Dr. Patrick M. Conner, both with The Miller Orthopaedic Clinic, Inc.,

to repair his right ACL and to perform some "minor" arthroscopic procedures on his left knee. The surgeries were performed on 20 August 2000 at Carolinas Medical Center in Charlotte, North Carolina. Dr. Connor repaired Jeffers' right ACL, while Dr. D'Alessandro performed additional procedures on both of Jeffers' knees.

Over the next year, Jeffers was able to completely rehabilitate his right knee, but continued to have weakness in his left knee, loss of speed and strength, and recurring pain and swelling in both knees. Although Jeffers played in some games during the 2001 season with the Carolina Panthers, the team ultimately terminated his contract in August 2002.

On 12 August 2003, Jeffers filed an action asserting a medical malpractice claim against Dr. D'Alessandro and The Miller Orthopaedic Clinic and claims against the Carolina Panthers for negligent retention, for intentional misconduct under *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (1991), and for breach of implied warranty. In his complaint, Jeffers alleged that, during the 20 August 2000 surgery, Dr. D'Alessandro performed additional, unauthorized procedures that went beyond Jeffers' informed consent.[1]

On 23 October 2003, the Carolina Panthers moved to dismiss Jeffers' complaint for lack of subject matter jurisdiction as to the claims against the Panthers, arguing that because of the CBA, Jeffers' claims were preempted by Section 301 of the LMRA. The Carolina Panthers alternatively requested that the trial court compel arbitration of Jeffers' claims against the team and stay the matter pending arbitration. On 23 January 2004, Jeffers took a voluntary dismissal of his breach of implied warranty claim against the Carolina Panthers.

In an order entered 1 April 2004, the trial court denied the Carolina Panthers' motion to dismiss, but granted their motion to compel arbitration. The trial court agreed with the Carolina Panthers' contention that Jeffers' negligent retention and *Woodson* claims were preempted by Section 301 of the LMRA based on *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 109 L. Ed. 2d 362, 110 S. Ct. 1904 (1990). The trial court concluded, however, that the factual allegations in the complaint could be read as stating a claim for relief under Section 301 for breach of the CBA. The court, therefore, denied the motion to dismiss. The trial court then determined that, under the

---

1. Jeffers voluntarily dismissed without prejudice his medical malpractice claim against Dr. D'Alessandro and The Miller Orthopaedic Clinic on 17 April 2006.

terms of the CBA, Jeffers' claims were subject to arbitration. It, therefore, granted the Carolina Panthers' motion to compel arbitration.

The trial court, on 30 April 2004, certified its order for immediate appeal under Rule 54(b) of the Rules of Civil Procedure. Jeffers' subsequent appeal to this Court was, however, dismissed as being an improper interlocutory appeal, *Jeffers v. D'Alessandro*, 169 N.C. App. 455, 612 S.E.2d 447, 2005 N.C. App. LEXIS 714, *13-14, 2005 WL 757178, *5 (April 5, 2005) (unpublished), and the Supreme Court denied discretionary review, 359 N.C. 633, 616 S.E.2d 235 (2005).

On 27 July 2005, Jeffers submitted a demand for arbitration under the CBA to the NFL Players Association. The NFL Management Council, which received a copy, construed the demand as a grievance under the CBA and, on behalf of the Carolina Panthers, denied the grievance as untimely and without merit. On 16 August 2005, Jeffers appealed the denial of his grievance and renewed his demand for arbitration. The parties agreed that prior to any hearing on the merits of Jeffers' grievance, the arbitrator would address "two threshold issues: the Club's contention that the grievance must be dismissed as untimely; and Jeffers' contention that the grievance should be dismissed because his claims against the Panthers are not subject to arbitration under the CBA."

In an opinion and award dated 25 March 2008, the arbitrator noted that "Jeffers has not contested the Club's claim that this grievance was not filed within the time limit set forth in Article IX of the CBA" and that Jeffers had limited his arguments to the second issue regarding the arbitrability of the claims. The arbitrator ultimately determined that there was no "compelling basis on which to conclude that Jeffers' claims against the Panthers are not subject to arbitration under the CBA." The arbitrator further concluded that Jeffers' "grievance must be dismissed as untimely under Article IX of the CBA."

The Carolina Panthers filed a motion to confirm the arbitration award on 27 March 2008. The trial court entered a judgment on the same date, confirming the award. Jeffers timely appealed to this Court from the order compelling arbitration and the judgment confirming the arbitration award.

I

[1] As a threshold matter, the Carolina Panthers argue that Jeffers is precluded by the "law of the case" doctrine from challenging the order compelling arbitration. The Carolina Panthers maintain that

this Court has already determined that Jeffers was required to arbitrate his claim when, in Jeffers' prior appeal, this Court stated that "[Jeffers] must be bound by the agreement he signed with the Carolina Panthers which required all disputes be sent to arbitration." *Jeffers*, 2005 N.C. App. LEXIS 714 at *10, 2005 WL 757178 at *3.

Under the law of the case doctrine, "[o]nce an appellate court has ruled on a question, that decision becomes the law of the case and governs the question not only on remand at trial, but on a subsequent appeal of the same case." *N.C. Nat'l Bank v. Virginia Carolina Builders*, 307 N.C. 563, 566, 299 S.E.2d 629, 631 (1983). The doctrine applies, however, "only to points actually presented and necessary for the determination of the case." *Creech v. Melnik*, 147 N.C. App. 471, 474, 556 S.E.2d 587, 589 (2001), *disc. review denied*, 355 N.C. 490, 561 S.E.2d 498 (2002).

Because this Court expressly declined to consider the merits of Jeffers' prior appeal due to its interlocutory nature and the fact that no substantial right was implicated, this Court necessarily did not resolve the issue presented here: whether the trial court erred in compelling Jeffers to submit his grievance to arbitration. Indeed, the prior panel concluded that a substantial right would not be prejudiced in the absence of immediate appellate review precisely because once the trial court entered judgment consistent with the arbitrator's decision, Jeffers could then, if he elected to do so, appeal the trial court's judgment on that basis. *Jeffers*, 2005 N.C. App. LEXIS 714 at *12-13, 2005 WL 757178 at *4.

## II

[2] We next address the trial court's determination that Jeffers' claims are preempted by Section 301 of the LMRA, 29 U.S.C. § 185. Section 301 governs "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . ." 29 U.S.C. § 185(a) (2009). Under Section 301, when the resolution of a state law claim is "substantially dependent" upon the interpretation or application of the provisions in a collective bargaining agreement, "that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220, 85 L. Ed. 2d 206, 221, 105 S. Ct. 1904, 1916 (1985) (internal citation omitted). *See also Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06, 100 L. Ed. 2d 410, 418-19, 108 S. Ct. 1877, 1881 (1988) ("[I]f the resolution of a state-law claim depends upon the meaning of a collective-

bargaining agreement, the application of state law . . . is pre-empted and federal labor-law principles . . . must be employed to resolve the dispute."). The test for preemption of a state law tort claim is whether "the duty to the employee of which the tort is a violation is created by a collective-bargaining agreement and without existence independent of the agreement." *Rawson*, 495 U.S. at 369, 109 L. Ed. 2d at 373, 110 S. Ct. at 1910.

Jeffers' complaint asserted the following causes of action, and underlying factual allegations, against the Carolina Panthers:

*The Carolina Panthers'
Requirement That its
Players Obtain Medical Care
from the Team Physician*

24. Jeffers' contracts with the Carolina Panthers were standard form NFL Player Contracts. On information and belief, in both 1999 and 2000, and for many years prior, all Carolina Panthers' football players signed such standard form NFL Player Contracts.

25. On information and belief, in both 1999 and 2000, and for many years prior, the Carolina Panthers sought to acquire football players possessed of special, exceptional, and unique football skills and abilities. Among other things, the standard form NFL Player Contract used by the Panthers during this time frame, including Jeffers' contracts, required each player to represent "that he has special, exceptional and unique knowledge, skill, ability, and experience as a football player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages."

26. On information and belief, in both 1999 and 2000, and for many years prior, the Carolina Panthers knew that the maintenance of its football players' special, exceptional, and unique football skills and abilities was essential to their professional football careers, and that the loss or destruction of such skills and abilities could end a player's NFL career.

27. On information and belief, in an effort to maintain and preserve the unique football skills and abilities of its players, the Carolina Panthers retained a team physician and created and maintained a system which required its players, including Jeffers, to establish a physician-patient relationship with, consult with,

submit to examination by, and make full disclosure to, the team physician.

28. On information and belief, the Carolina Panthers sought to ensure that its players, including Jeffers, received medical care and treatment from the team physician. Among other things, the standard form NFL Player Contracts signed by the Carolina Panthers' players, including Jeffers, provided that the Carolina Panthers would furnish its injured players "such medical and hospital care . . . as the Club physician may deem necessary . . . [.]" On information and belief, the Carolina Panthers discouraged its players from receiving medical and surgical care from physicians other than the team physician or his designees, and expressly and impliedly pressured its players to utilize the medical and surgical services of the team physician.

29. Under the system created and maintained by the Carolina Panthers, its players, including Jeffers, placed special trust and confidence in the professional medical skills and abilities of the team physician. Jeffers and the other players reasonably believed that the team physician was highly qualified, skilled, and competent, and reasonably expected that the team physician would not perform or prescribe medical or surgical treatments or procedures which would be detrimental to their professional careers. Among other things, Jeffers and the other players reasonably believed that prior to performing any surgical procedure, the team physician would fully explain the nature of, and the potential risks and benefits of, the procedure and obtain the affected player's informed consent.

30. Upon information and belief, from 1994 through 2001, the Carolina Panthers retained Defendant Dr. D'Alessandro (and perhaps the Miller Clinic as well) as the team physician.

. . . .

*SECOND CAUSE OF ACTION*
*Negligence/Negligent Retention*
*(Richardson Sports Limited*
*Partnership and PFF, Inc.)*

89. Jeffers realleges and incorporates by reference herein paragraphs 1 through 88 of his Complaint.

90. In selecting and retaining a team physician, in creating and maintaining a system in which players were required to

establish a physician-patient relationship with the team physician, and in seeking to ensure that its players sought and obtained medical care and attention from the team physician, the Carolina Panthers had a duty to exercise reasonable care to protect its football players, including Jeffers, from injury. Among other things, the Carolina Panthers had a duty to select and retain a team physician who was skilled, competent, and duly cognizant of the importance of preserving and maintaining the special and unique skills of the team's players.

91. On information and belief, in his years as team physician for the Carolina Panthers, Dr. D'Alessandro had exhibited a propensity to perform surgical procedures on players which exceeded the scope of the players' informed consent, and to perform surgical procedures which were not indicated or medically required.

92. On information and belief, in his years as team physician for the Carolina Panthers, Dr. D'Alessandro's performance of surgical procedures without consent, and performance of surgical procedures which were not indicated, directly and proximately caused serious injury to team players, including but not limited to career-altering or career-ending injuries.

93. On information and belief, both prior to the time Jeffers joined the Carolina Panthers and prior to the time Dr. D'Alessandro performed the August 20, 2000 surgery complained of herein, the Carolina Panthers had opportunity to observe, and did in fact observe and know of, his performance of surgical procedures which exceeded and therefore were without players' consent, and his performance of surgical procedures which were not indicated.

94. Upon learning of Dr. D'Alessandro's performance of surgical procedures on players without obtaining such players' informed consent and upon learning of his performance of procedures which were not indicated, the Carolina Panthers had a duty to terminate Dr. D'Alessandro as team physician, and to alter the team system under which players received medical care and treatment from team physicians.

95. Despite their prior knowledge of the propensity of Dr. D'Alessandro to perform surgery beyond the scope of the informed consent requested and received, the Carolina Panthers

did not discharge Dr. D'Alessandro as team physician or alter the system under which players received medical care and treatment from team physicians prior to the surgery on Jeffers. On information and belief, Dr. D'Alessandro remained as team physician through 2001, after his performance of the lateral releases, interval releases, and microfracture without Jeffers' knowledge or consent [that] ended Jeffers' NFL career.

96. By retaining Dr. D'Alessandro as team physician and by maintaining a system whereby Carolina Panthers' players were required to form a physician-patient relationship with Dr. D'Alessandro with full knowledge of Dr. D'Alessandro's above-described propensities, and in such other manner as may be proven at trial, the Carolina Panthers failed to exercise ordinary care to protect Jeffers from injury and was negligent.

. . . .

THIRD CAUSE OF ACTION
Intentional Engagement in Misconduct
Substantially Certain to Injure Jeffers
(Richardson Sports Limited
Partnership and PFF, Inc.)

100. Jeffers realleges and incorporates by reference herein paragraphs 1 through 99 of his Complaint.

101. By retaining Dr. D'Alessandro as team physician, and by maintaining a system wherein its players were required to form a physician-patient relationship with Dr. D'Alessandro, in the face of knowledge that (i) Dr. D'Alessandro had a propensity to, and did in fact, perform surgical procedures on Carolina Panthers' players without obtaining such players' informed consent, (ii) Dr. D'Alessandro had a propensity to, and did in fact, perform surgical procedures on Carolina Panthers' players which were not indicated or medically required, and (iii) such surgical procedures had in fact injured players, the Carolina Panthers intentionally engaged in misconduct which the Carolina Panthers knew was substantially certain to cause serious injury.

The Carolina Panthers maintain that any duty it might owe Jeffers with respect to the negligent retention and *Woodson* claims arises out of the following provisions in Article XLIV of the CBA, entitled "Players' Rights to Medical Care and Treatment":

*Section 1.* Club Physician: Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. . . .

. . . .

*Section 3.* Players' Right to a Second Medical Opinion: A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

*Section 4.* Players' Right to a Surgeon of His Choice: A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (*e.g.,* emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

*Section 5.* Standard Minimum Pre-Season Physical: Each player will undergo a standardized minimum pre-season physical examination, . . . which will be conducted by the Club physician. . . .

In addition, paragraph 9 of Jeffers' player contract states that "if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary . . . ."

Our review of the complaint and the CBA convinces us that Jeffers' claims are substantially dependent on the CBA. Article XLIV of the CBA sets out the rights and obligations of both the Clubs and

the players in connection with medical care. While the essence of each of Jeffers' causes of action is that the Carolina Panthers wrongfully retained Dr. D'Alessandro and required Jeffers and other players to have a physician-patient relationship with the doctor, the duty of the Panthers to retain a team physician and the duty of the players to have a physician-patient relationship with that physician arise out of Article XLIV. Without the CBA, the Carolina Panthers would have no obligation to have a team physician at all. *See Sherwin v. Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1178 (N.D.N.Y. 1990) ("The Colts did not owe a duty to provide medical care to the plaintiff independent of the relationship established in the [CBA and standard player contract].").

The United States Supreme Court's decision in *United Steelworkers of Am. v. Rawson* is germane here. In *Rawson*, 495 U.S. at 364-65, 109 L. Ed. 2d at 371, 110 S. Ct. at 1907, the plaintiffs, representatives of miners who died in a mine fire, alleged that the miners' union had negligently inspected the mine. The plaintiffs argued, and the Idaho Supreme Court agreed, that "the Union may be liable under state tort law because its duty to perform that inspection reasonably arose from the fact of the inspection itself rather than the fact that the provision for the Union's participation in mine inspection was contained in the labor contract." *Id.* at 370-71, 109 L. Ed. 2d at 374, 110 S. Ct. at 1910.

In reversing the Idaho Supreme Court, the *Rawson* Court held that because the initial duty to inspect arose out of the collective bargaining agreement, the plaintiffs' negligence claim was preempted by Section 301, explaining: "If the Union failed to perform a duty in connection with inspection, it was a duty arising out of the collective-bargaining agreement signed by the Union as the bargaining agent for the miners. Clearly, the enforcement of that agreement and the remedies for its breach are matters governed by federal law." *Id.* at 371, 109 L. Ed. 2d at 374-75, 110 S. Ct. at 1910. *See also Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394, 96 L. Ed. 2d 318, 328, 107 S. Ct. 2425, 2431 (1987) ("Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.' " (quoting *Int'l Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 859 n.3, 95 L. Ed. 2d 791, 801 n.3, 107 S. Ct. 2161, 2167 n.3 (1987))).

The same is true here. Any duty to use reasonable care in retaining Dr. D'Alessandro arose only because the Carolina Panthers hired

Dr. D'Alessandro as a team physician. *See Gosnell v. Southern Railway Co.*, 202 N.C. 234, 236, 162 S.E. 569, 570 (1932) ("[W]here an employer, in recognition of his legal or moral obligations to his employee, employs a physician or surgeon to render professional services to his employee, who is in need of such services, whether as the result of the negligence of the employer or otherwise, the only duty which the employer owes to such employee, is to exercise reasonable care in the selection and employment of the physician or surgeon."). Yet, the duty to hire Dr. D'Alessandro in the first instance arose solely from the CBA.

In a case similar to this one, a former player with the Indianapolis Colts alleged that "while he was under contract to the Colts, he suffered an injury for which the Colts and their team doctors . . . failed to provide adequate medical care . . . ." *Sherwin*, 752 F. Supp. at 1173. The plaintiff sued for fraud and negligent misrepresentation in failing to disclose his true condition, negligence in the provision of medical care, and intentional and negligent infliction of emotional distress. *Id.* at 1178. In holding that these claims were preempted, the trial court reasoned:

> It is clear that plaintiff's claims are "substantially dependent" upon analysis of the agreements and must be treated as section 301(a) claims under *Allis-Chalmers*. The Colts did not owe a duty to provide medical care to the plaintiff independent of the relationship established in the agreements. The court cannot resolve plaintiff's claims based on inadequate medical care without interpreting the clauses establishing those duties in the agreements. . . . Moreover, the Colts' duties are not those that would be "owed to every person in society," as *Rawson* seems to require to establish independence from the collective bargaining agreement. The Colts owed a duty to provide adequate medical care . . . only to their players covered by the standard player agreement and the CBA.

*Id.* The court concluded that the plaintiff's claims for negligent and intentional infliction of emotional distress also arose "out of the CBA, in that they are derived from the same circumstances and obligations underlying the other claims." *Id. See also Holmes v. Nat'l Football League*, 939 F. Supp. 517, 527 (N.D. Tex. 1996) ("The touchstone of each of Holmes' state-law tort claims is that he was misled into submitting to the Lions [urine] test. To resolve these claims the court must perforce analyze the CBA and the collectively-bargained Drug Program to ascertain whether the Lions defrauded Holmes, or

instead had the right to request that he submit to a pre-employment drug test.").

In both *Sherwin* and *Holmes*, the courts looked at the essence of the player's state law claims and determined that, at the core, those claims required analysis of the CBA. Likewise, here, the touchstone of Jeffers' claims—no matter how couched or labeled—is that the Carolina Panthers acted improperly in providing him medical care through the team physician. These claims necessarily derive from the obligations in the CBA and will require analysis of the CBA in order to be resolved, just as did the claims in *Sherwin* and *Holmes.*

Jeffers, however, asserts that because his claims do not contend that the Carolina Panthers failed to comply with the specific provisions of the CBA, the claims cannot be preempted. This argument was rejected in *Allis-Chalmers*, in which the Supreme Court reviewed a Wisconsin Supreme Court decision finding no preemption because the plaintiff's claims did not involve a violation of a specific provision of the contract. 471 U.S. at 214-15, 85 L. Ed. 2d at 217-18, 105 S. Ct. at 1912-13.

The Supreme Court first pointed out that the Wisconsin Supreme Court had overlooked the possibility of implied rights under the contract: "The assumption that the labor contract creates no implied rights is not one that state law may make." *Id.* at 215, 85 L. Ed. 2d at 218, 105 S. Ct. at 1913. An arbitrator might construe the labor contract to provide relief implied from the contract. *Id.* According to the Court, for purposes of Section 301, there is no distinction between an explicit contractual duty and an implied duty "[s]ince the extent of either duty ultimately depends upon the terms of the agreement between the parties" and "both are tightly bound with questions of contract interpretation that must be left" to be resolved in accordance with Section 301. *Id.* at 216, 85 L. Ed. 2d at 218, 105 S. Ct. at 1913. The Court concluded as to the possibility of implied rights: "The duties imposed and rights established through the state tort thus derive from the rights and obligations established by the contract." *Id.* at 217, 85 L. Ed. 2d at 219, 105 S. Ct. at 1914.

As applied to this case, Jeffers incorrectly assumes, as did the Wisconsin Supreme Court, that he would only be entitled to relief under the CBA for an explicit violation, such as a Club's failure to have any team orthopedic physician or a Club's prohibiting a player from choosing his own surgeon. That assumption, however, constitutes an interpretation of the CBA and, as was the case in *Allis-*

*Chalmers,* is a questionable assumption. The CBA expressly states that it is intended to "represent[] the *complete* understanding of the parties on all subjects covered herein[,]" including the "Players' Rights to Medical Care and Treatment." (Emphasis added.) For example, an arbitrator could decide that the CBA requires not only that the Club retain a physician, but that the physician be competent. In other words, an arbitrator could have concluded—if Jeffers proved his allegations regarding Dr. D'Alessandro—that the retention of Dr. D'Alessandro was a violation of the CBA's requirement in Article XLIV that the Club retain a team physician.

Moreover, even in the absence of a direct CBA violation, a court considering Jeffers' claims would be confronted with the provision in Section 4 of Article XLIV: "[P]rovided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery." Jeffers' claims would require analysis and interpretation of this clause of the CBA.

Thus, Jeffers' claims are substantially dependent upon analysis of the CBA and player's contract and those claims are, therefore, preempted by Section 301. Having concluded that Jeffers' state law claims are preempted, we must still address whether the trial court properly determined that, assuming the complaint sets out a Section 301 claim for breach of the CBA, the claim was required to be arbitrated. "If a claim is identified as a section 301 claim, it is subject to the arbitration provisions, if any, of the collective bargaining agreement." *Sherwin,* 752 F. Supp. at 1177.

[3] In considering whether a particular dispute is subject to arbitration, "the trial court should determine (1) the validity of the contract to arbitrate and (2) whether the subject matter of the arbitration agreement covers the matter in dispute." *Ragan v. Wheat First Sec., Inc.,* 138 N.C. App. 453, 455, 531 S.E.2d 874, 876, *disc. review denied,* 353 N.C. 268, 546 S.E.2d 129 (2000). "Once the 'court answers these questions in the affirmative, the parties must take up all additional concerns with the arbitrator.' " *Id.* (quoting *Elzinga & Volkers, Inc. v. LSSC Corp.,* 838 F. Supp. 1306, 1309 (N.D. Ind. 1993)). Jeffers does not dispute the validity of the CBA and his standard player contract, but rather contends that the trial court erred in compelling arbitration because he "never agreed to arbitrate his *Woodson* and negligent retention claims against the Panthers."

JEFFERS v. D'ALESSANDRO

[199 N.C. App. 86 (2009)]

Article IX of the CBA, entitled "Non-Injury Grievance," provides for arbitration of "[a]ny dispute . . . arising after the execution of this Agreement and involving the interpretation of, application of, or compliance with, any provision of this Agreement, the NFL Player Contract, or any applicable provision of the NFL Constitution and By-laws pertaining to terms and conditions of employment of NFL players . . . ." Jeffers' claims concern the interpretation or application of Article XLIV's medical rights provisions, which outline the use of team doctors and the physician-patient relationship between the doctors and the team's players, and the Carolina Panther's potential liability. Jeffers' claims are, therefore, subject to arbitration in accordance with the terms of the CBA.

In arguing that his claims are not subject to arbitration, Jeffers focuses on whether they involve the interpretation or construction of the CBA, but ignores the CBA's reference to "application." "In interpreting contracts, . . . '[t]he various terms of the [contract] are to be harmoniously construed, and if possible, *every word and every provision is to be given effect.*'" *Singleton v. Haywood Elec. Membership Corp.*, 357 N.C. 623, 629, 588 S.E.2d 871, 875 (2003) (emphasis added) (quoting *Gaston County Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 N.C. 293, 300, 524 S.E.2d 558, 563 (2000)). Even if we were to agree with Jeffers that his claims do not involve an interpretation of the CBA, which we do not, "application" cannot be read out of the contract. Jeffers' claims involve the application of Article XLIV's requirement that each Club retain a team orthopedic physician.

The trial court, therefore, properly granted the motion to compel arbitration. Because Jeffers makes no further argument as to why the arbitration award should not be confirmed, we affirm.

Affirmed.

Judges STEELMAN and STEPHENS concur.