FITZWATER, District Judge:
 

 This is an action by a professional football player who was enrolled involuntarily in the National Football League Policy and Program for Drugs of Abuse and Alcohol (the “Drug Program”) after testing positive for the use of marihuana, and was thereafter suspended for four games without pay when subsequent tests showed continued drug use. Defendants’ motion to dismiss presents the question whether plaintiffs assertion that he was denied a “full due process hearing” in connection with the grievance of his involuntary enrollment and suspension states a breach of contract claim pursuant to § 301 of the Labor Management Relations Act of 1947 (“LMRA”), 29 U.S.C. § 185. The court must also decide whether § 301 of the LMRA preempts plaintiffs pendent state-law claims for fraudulent inducement, intentional infliction of emotional distress, breach of implied covenant of good faith and fair dealing, and invasion of privacy, which are based upon the administration, use, and consequences of the initial drug test.
 

 I
 

 Plaintiff Clayton A. Holmes (“Holmes”) sues defendants National Football League (“NFL”) and National Football League Management Council (“Management Council”). He challenges on various grounds the administration of a drug test that led to his involuntary enrollment in the Drug Program, and eventually to a four-game suspension -without pay, as well as the denial of his appeals from the disciplinary actions. Holmes seeks actual damages in an amount not less than $1 million, and $30 million in punitive damages.
 
 [1]
 

 During the relevant time period, Holmes was employed by The Dallas Cowboys Football Club (the “Cowboys”), one of
 
 *520
 
 30 member clubs of defendant NFL.
 
 [2]
 
 In February 1995 Holmes became a restricted free agent under the NFL Collective Bargaining Agreement 1993-2000 (“CBA”), entered into May 6, 1993 between defendant Management Council, on behalf of all NFL clubs, and the National Football League Players Association (“NFLPA”), on behalf of all NFL players. The CBA allowed Holmes to market his skills to other NFL teams. The Cowboys presented Holmes with a tender offer, which permitted the team to retain Holmes as a player by matching any competing proposal. Prior to reaching agreement with the Cowboys, however, Holmes visited the Detroit Lions (the “Lions”) to explore the possibility of employment. The Lions requested that Holmes submit to a drug test, informing him that the urine specimen was required as a condition of employment, and was being used for the purpose of detecting the use of steroids. On March 9, 1995 Holmes provided the sample, and the test results showed that he had used marihuana metabolites. Holmes alleges that the Lions and defendants knowingly misrepresented that the drug test was a condition of possible employment; that he was required to provide the specimen; and that the sample was being taken solely to detect for the use of steroids, when the true purpose was to test for marihuana, cocaine, and other controlled substances.
 

 The Lions purported to administer the test to Holmes pursuant to the Drug Program, which was adopted as part of the collective bargaining process between the Management Council and the NFLPA. The Drug Program is a three-stage program designed to treat and/or discipline players with substance abuse problems. Insofar as relevant here, Stage 1 involves a preliminary medical evaluation and, if necessary, treatment for players who enter the program through a positive drug test. A player who is referred to Stage 1 by reason of a positive drug test advances to Stage 2, where he becomes subject to unannounced drug testing conducted under the direction of the program’s Medical Advis- or. A player who tests positive for drugs while in Stage 2 is subject to discipline that includes a fine of four weeks’ regular season pay. A player who tests positive a second time during Stage 2 faces a four-game suspension without pay, and advances to Stage 3. A positive drug test in Stage 3 results in banishment from the NFL for a period of at least one calendar year.
 

 On March 31, 1995 the NFL involuntarily enrolled Holmes in Stage 1 of the Drug Program as a result of the positive test administered by the Lions. He then advanced to Stage 2. On July 13 and 14, 1995, and again on August 30, 1995, Holmes tested positive for drugs. On July 26, 1995 the NFL fined Holmes as a result of the July test. On September 14, 1995 the NFL suspended Holmes without pay for four regular season games, and placed him in Stage 3 of the Drug Program, based on the August drug test.
 
 [3]
 

 On September 4, 1995 Holmes appealed the fine, and on September 19,1995 appealed the four-game suspension, to NFL Commissioner Paul Tagliabue (“Commissioner Tagliabue”), as permitted by § N of the Drug Program.
 
 [4]
 
 The Commissioner set a hearing
 
 *521
 
 for October 18, 1995.
 
 [5]
 
 Holmes did not challenge the Lions test until mid-October, shortly before the hearing on his appeals.
 

 Beginning on September 4, 1995 Holmes’ counsel initiated a series of letters to NFL officials and Management Council attorneys in which he requested copies of relevant medical records and drug test results, or advised them that he had not received the documents. It is undisputed, however, that prior to the October 18 hearing, Holmes’ counsel had been provided the results of the August 30 test that triggered Holmes’ four-game suspension.
 

 Holmes’ counsel requested a postponement of the hearing on the ground that he had not been given documents related to Holmes’ entry into the Drug Program, the NFL’s notification to Holmes that he had been placed in Stage 2 of the program, and information pertaining to tests under the program. The Commissioner denied the continuance request, and convened the hearing as scheduled. The Management Council presented evidence of Holmes’ positive drug tests. Holmes primarily questioned the propriety of his entry into the Drug Program and the accuracy of the positive tests. His counsel raised procedural challenges to his inability to cross-examine witnesses, to obtain and introduce controverting expert testimony without prior document production, to contest the propriety of his entry into the Drug Program based on the Lions test, and to challenge his receipt of the July 26, 1995 letter notifying him that he had béen fined.
 

 During the hearing, and by October 19 letter, Commissioner Tagliabue directed that the Management Council provide Holmes the results from the March 1995 Lions test, and of the positive tests of July 13 and 14. He also ruled that Holmes would be permitted to challenge the adequacy of the written notice of the fine based on the July tests, and would be afforded an opportunity to present expert testimony by conference call to dispute the results of all drug tests administered in 1995, including the Lions test. The Commissioner imposed a deadline for submission of additional evidence and testimony, and advised Holmes’ counsel of his intent to conclude all aspects of the hearing by October 31, 1995, with a decision to be issued shortly thereafter.
 

 After the Management Council submitted documents to Holmes, his counsel complained to the Commissioner that they were incomplete, thus precluding him from obtaining expert testimony that he could introduce into the hearing record. He did not, however, challenge the completeness of the August 30 test results, which consisted of 62 pages. Holmes’ counsel did assert that his proposed experts had concluded that the tendered documents were incomplete, and deprived him of a fair opportunity to present a defense because no expert opinion could be rendered on such a record. Holmes requested complete documentation concerning the July 13 and 14 tests and the Lions test, and sought any documented testing that had been recorded
 
 *522
 
 since the date he entered the Drug Program. Holmes’ counsel separately advised the Commissioner of his insistence upon a full hearing, including the right to examine and cross-examine witnesses, to confront accusers, and to put on a defense. He filed a written request for a full hearing and a temporary stay of disciplinary action and of mandatory participation in the Drug Program. He also submitted a letter brief, arguing
 
 inter alia
 
 that no decision should be made until Holmes received a formal hearing.
 

 On November 3, 1995 the Commissioner issued his decision. The ruling disposed of Holmes’ appeal from the Lions test, the fine based on the July tests, and the four-game suspension stemming from the August test. The Commissioner determined, first, that Holmes’ objection to the Lions test was not timely asserted. He ruled, second, that Holmes’ appeal from the fine based on the July tests was also untimely. In doing so, he considered but rejected an affidavit that Holmes had submitted in which he stated that he did not “recall” receiving the July 26 notice letter, and accepted instead sworn evidence from the Cowboys that the letter had been delivered. The Commissioner concluded, third, that Holmes’ appeal from the four-game suspension based on the August test must be denied. Holmes had “presented no evidence that the test was inaccurate, nor any reason to suspect that it was.” Nov. 3, 1995 Ltr. at 3.
 

 Following the Commissioner’s adverse ruling, Holmes filed the instant lawsuit against the NFL and the Management Council. He contends that defendants breached the CBA, in violation of § 301 of the LMRA,
 
 [6]
 
 by upholding his involuntary enrollment in the Drug Program, and suspending him for four games, without granting him a full due process hearing and an opportunity to confront his accusers, cross-examine witnesses, and present evidence. Holmes also alleges Texas-law claims for fraudulent inducement, intentional infliction of emotional distress, breach of implied covenant of good faith and fair dealing, and invasion of privacy arising from the administration, use, and consequences of the drug test conducted by the Lions.
 

 Defendants move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), contending that Holmes’ § 301 claim is without merit as a matter of law.
 
 [7]
 
 Defendants argue that Holmes’ lawsuit rests on the threshold allegation “that his original placement into the Drug Program was not accomplished in strict accordance with the Program’s terms.” Ds. Mem. at 7. They therefore maintain that Holmes’ action is an ordinary labor grievance that, having been resolved in accordance with the appeal process prescribed by the Drug Program, cannot be relitigated in federal court under the guise of a § 301 breach of contract theory or any other basis. Defendants also assert that the LMRA preempts
 
 *523
 
 Holmes’ pendent state-law claims.
 
 [8]
 

 II
 

 The court turns first to defendants’ motion to dismiss Holmes’ § 301 breach of contract claim.
 

 A
 

 Defendants contend Holmes has exhausted-the grievance and appeal procedures set forth in the CBA and Drug Program, and may only state a claim if he can show both that the administrative resolution was in derogation of the terms of the labor contract and that his union failed to represent him fairly.
 

 Holmes does not appear to quarrel with the ample body of law that supports judicial deference to resolution of labor disputes by the tribunal that the parties have selected. He argues instead that the well-settled principles are superseded when the grievance is resolved in violation of a right to a full due process hearing prescribed by a collective bargaining agreement. He also contends that the arbitrator must act within the scope of his authority, and that the arbitrator does not do so when he issues a final and binding ruling without allowing such a hearing.
 

 Holmes cites
 
 Hall v. Eastern Air Lines, Inc.,
 
 511 F.2d 663, 664 (5th Cir.1975) (per curiam), for the proposition that district court review is not foreclosed when a plaintiff alleges a denial of due process. His reliance on
 
 Hall
 
 is misplaced.
 
 Hall
 
 is one in a line of eases arising under the Railway Labor Act (“RLA”), 45 U.S.C. §§ 151-188. The RLA applies to railroads and airlines.
 
 See
 
 45 U.S.C. § 151 (First) (Supp.1996) (defining “carrier” to include certain railroads); 45 U.S.C. § 181 (stating that the RLA “shall cover every common carrier by air engaged in interstate or foreign commerce”). Congress established the National Railroad Adjustment Board (“NRAB”) to provide a final and complete means of settling minor disputes — those involving the interpretation or application of a particular provision of a collective bargaining agreement to a particular situation.
 
 Brotherhood of Locomotive Eng’rs v. St. Louis Southwestern Ry. Co.,
 
 757 F.2d 656, 658-59 (5th Cir.1985); 45 U.S.C. § 153. The provisions of the RLA dealing with the NRAB have been treated by the courts as compulsory arbitration.
 
 See Hirras v. National R.R. Passenger Corp.,
 
 44 F.3d 278, 280 (5th Cir.1995) (referring to RLA’s “mandatory arbitration provisions”);
 
 Sheehan v. Union Pac. R.R. Co.,
 
 576 F.2d 854, 856 (10th Cir.) (per curiam) (citing
 
 Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R.,
 
 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957)),
 
 rev’d on other grounds,
 
 439 U.S. 89, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978) (per curiam). Decisions by the NRAB are considered to be government acts that are subject to constitutional restraints.
 
 See Elmore v. Chicago & III. Midland Ry. Co.,
 
 782 F.2d 94, 96 (7th Cir.1986). So, for example, in
 
 Shafii v. PLC British Airways,
 
 22 F.3d 59 (2d Cir.1994), the Second Circuit held that an arbitrator who stood in the shoes of the NRAB was subject to the same limits as is the Board..
 
 Id.
 
 at 64. Pursuant to the collective bargaining agreement, the employee and the airline agreed to bypass the System Board of Adjustment — the voluntary counterpart to the mandatory NRAB — in favor of voluntary binding arbitration.
 
 Id.
 
 at 61. “Because the arbitrator occupies the position of the statutorily-created NRAB,” the court held that the arbitrator “is subject to the same statutory and
 
 constitutional
 
 constraints as the NRAB,”
 
 id.
 
 (emphasis added), including the right to due process.
 
 Id.
 
 at 64.
 

 Unlike cases governed by the RLA, federal law does not mandate arbitration between the NFL and its players. Because the choice of arbitration is a voluntary component of the labor contract and Drug Program, the arbitrator is not deemed to be a government official or the equivalent, and constitutional rights do not apply.
 

 This principle was aptly explained in
 
 Elmore:
 

 Private arbitration, however, really is private; and since constitutional rights are in general rights against government officials and agencies rather than against private individuals and organizations, the fact that a private arbitrator denies the procedural
 
 *524
 
 safeguards that are encompassed by the term “due process of law” cannot give rise to a constitutional complaint.
 

 Elmore,
 
 782 F.2d at 96. In
 
 Elmore
 
 a terminated railroad worker brought suit alleging that his employer, a private railroad, had denied him due process in the discharge hearing.
 
 Id.
 
 at 95. The NRAB upheld the firing, and the district court dismissed for lack of jurisdiction the worker’s suit to set aside the Board’s decision.
 
 Id.
 
 The worker appealed, contending that judicial review should be available in the case of a violation of a constitutional right.
 
 Id.
 
 The Seventh Circuit held that if the worker had been deprived of due process, it was the railroad, not the NRAB, that had done so.
 
 Id.
 
 at 96. Because the railroad was a private entity, there could be no constitutional violation.
 
 Id.
 
 at 96-97.
 

 B
 

 The standards that apply in the case of voluntary arbitration require rejection of Holmes’ § 301 breach of contract claim. “Review of an arbitration proceeding is narrowly limited. A court will not disturb an award if it ‘draws its essence from the collective bargaining agreement’ and is not based on the arbitrator’s ‘own brand of industrial justice.’”
 
 Exxon Corp. v. Baton Rouge Oil & Chem. Workers Union,
 
 77 F.3d 850, 853 (5th Cir.1996) (quoting
 
 United Steelworkers of Am. v. Enterprise Wheel & Car Corp.,
 
 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (I960)). The court “may not reconsider an award based on alleged errors of fact or law or misinterpretation of the contract.”
 
 Id.
 
 (citing
 
 United Paperworkers Int’l Union v. Misco, Inc.,
 
 484 U.S. 29, 36, 108 S.Ct. 364, 369-70, 98 L.Ed.2d 286 (1987)). “[T]he arbitrator’s award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator’s own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision. Of course, decisions procured by the parties through fraud or through the arbitrator’s dishonesty need not be enforced.”
 
 United Paperworkers,
 
 484 U.S. at 38, 108 S.Ct. at 371. “The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations. These statutes reflect a decided preference for private settlement of labor disputes without the intervention of government^]”
 
 Id.
 
 at 37, 108 S.Ct. at 370.
 

 Parties who bargain for arbitration to settle disputes are “free to set the procedural rules” to be followed.
 
 Id.
 
 at 39, 108 S.Ct. at 371. Holmes alleges that defendants upheld his involuntary enrollment in the Drug Program, and four-game suspension, “without granting Plaintiff a full due process hearing and an opportunity to confront his accusers, cross-examine witnesses, and to present evidence in support of his appeal.” Am.Compl. at ¶ 11(16). Commissioner Tagliabue effectively construed § N of the Drug Program and, to the extent not superseded by § N, Article XI (Commissioner Discipline) of the CBA, by adopting and following the procedures in question for resolving Holmes’ appeal. “This, in effect, was a construction of what the [Drug Program and CBA] required[.]”
 
 United Paperworkers,
 
 484 U.S. at 39, 108 S.Ct. at 371. “[W]hen the subject matter of a dispute is arbitrable, ‘procedural’ questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator.”
 
 Id.
 
 at 40, 108 S.Ct. at 372 (citing
 
 John Wiley & Sons, Inc. v. Livingston,
 
 376 U.S. 543, 557, 84 S.Ct. 909, 918, 11 L.Ed.2d 898 (1964)).
 

 Federal courts “have often looked to the [Arbitration] Act for guidance in labor arbitration cases.”
 
 Id.
 
 at 40 n. 9, 108 S.Ct. at 372 n. 9. Under the Act, “the federal courts are empowered to set aside arbitration awards on [procedural] grounds only when ‘the arbitrators were guilty of misconduct ... in refusing to hear evidence pertinent and material to the controversy.’ ”
 
 Id.
 
 at 40, 108 S.Ct. at 372 (quoting 9 U.S.C. § 10(c); citing
 
 Commonwealth Coatings Corp. v. Continental Casualty Co.,
 
 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968)). If an arbitrator’s procedural error is “not in
 
 *525
 
 bad faith or so gross as to amount to affirmative misconduct,” it will not warrant judicial intervention.
 
 Id.
 
 Indeed, the “instances when an arbitrator’s procedural aberrations rise to the level of affirmative misconduct” are “very rare.”
 
 See id.
 
 at 40 n. 10, 108 S.Ct. at 372 n. 10.
 

 Holmes has not alleged that the Commissioner’s ruling was procured by the parties’ fraud, or by dishonesty, bad faith, or affirmative misconduct on the part of the Commissioner. He has thus failed to state a § 301 breach of contract claim on which relief can be granted.
 

 Nor does it appear from the court’s review of the record that Holmes could state such a claim if given leave to amend his complaint. The court need not therefore grant such leave before dismissing this action.
 
 See FDIC v. Conner,
 
 20 F.3d 1376, 1385 (5th Cir.1994) (holding that “leave to amend need not be granted when it would be futile to do so”).
 
 [9]
 

 The Commissioner affirmed Holmes’ entry into the Drug Program (the result of the Lions test), and the imposition of the fine (the consequence of the July tests), based on the untimeliness of the appeals. Section N of the Drug Program explicitly limits the time within which an appeal must be lodged. The Commissioner’s ruling obviously drew its essence from the Drug Program and did not reflect his own notions of industrial justice. Holmes cannot show that he was deprived of evidence that would have enabled him to establish that he appealed the tests within the time prescribed by the Drug Program. The Commissioner in fact directed that the hearing record be left open so that Holmes could introduce additional evidence to challenge his receipt of the July 26 fine notification. The proof that Holmes presented was inadequate. There is no hint in the record that the parties procured the ruling by fraud, or that the Commissioner acted dishonestly, in bad faith, or in a manner that may be deemed affirmative misconduct. Holmes has not shown that if given additional time or procedural rights, he could have converted stale appeals into timely ones. There is no indication of procedural aberrations that “rise to the level of affirmative misconduct.”
 

 The only disciplinary measure that the Commissioner found necessary to address on the merits was the four-game suspension that stemmed from the August test. This decision, as did the others, drew its essence from the Drug Program and did not constitute the Commissioner’s own brand of industrial justice. Additionally, Holmes did not complain that he had been deprived of the records pertinent to this test. He could not have, because he had been provided these test results in advance of the hearing. He did not base his request to. postpone the hearing on the need to obtain the August test results. The record will not support an allegation that this ruling was obtained by fraud or that the Commissioner was guilty of dishonesty, bad faith, or affirmative misconduct. The facts are to the contrary. Moreover, although Holmes possessed the August test results in advance of the hearing, the Commissioner left the record open, and permitted Holmes additional time to retain experts and introduce testimony to demonstrate the inaccuracy of the test. He was simply unable to adduce evidence that the test was faulty or even to suspect that it was. It would be futile to permit Holmes to amend to allege a § 301 claim based on his appeal of the August 30 test.
 

 Accordingly, the court holds that Holmes’ § 301 claim must be dismissed, and that he should not be permitted to replead.
 

 Ill
 

 Defendants move to dismiss Holmes’ state-law claims for fraudulent inducement, intentional infliction of emotional distress, breach of implied covenant of good faith and fair dealing, and invasion of privacy, on the ground that they are preempted by § 301 the LMRA.
 

 
 *526
 
 A
 

 Defendants maintain that the state-law claims are preempted by federal law because they all flow from, and relate to, actions defendants undertook in accordance with the express terms of the Drug Program, and that their resolution depends entirely upon the interpretation of the CBA. Defendants argue that it is impossible to resolve Holmes’ assertions regarding the Drug Program and the Lions test without reference to the Drug Program’s terms. They reason that his claims about the testing and treatment he received cannot be extricated from the terms of the Drug Program.
 

 Holmes responds that the claims set out in his amended complaint do not depend upon an interpretation of the CBA. He argues that under settled law, his state claims are not preempted merely because the court would have to decide precisely the same issue and analyze the same facts as would the arbitrator, so long as it is possible to resolve the claims without interpreting the CBA. Holmes posits that state-law claims that are intertwined with a CBA are not preempted so long as they are not inextricably intertwined.
 

 B
 

 Section 301 preemption jurisprudence is familiar. “[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law.”
 
 Allis-Chalmers Corp. v. Lueck,
 
 471 U.S. 202, 220, 105 S.Ct. 1904, 1916, 85 L.Ed.2d 206 (1985) (citation omitted);
 
 Smith v. Houston Oilers, Inc.,
 
 87 F.3d 717, 719 (5th Cir.1996). “[I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law ... is pre-empted and federal labor-law principles — necessarily uniform throughout the Nation — must be employed to resolve the dispute.”
 
 Lingle v. Norge Div. of Magic Chef, Inc.,
 
 486 U.S. 399, 405-06, 108 S.Ct. 1877, 1881, 100 L.Ed.2d 410 (1988) (footnote omitted);
 
 see Reece v. Houston Lighting & Power Co.,
 
 79 F.3d 485, 487 (5th Cir.),
 
 petition for cert. filed,
 
 65 U.S.L.W. 3084 (U.S. July 9, 1996) (No. 96-52). “The preemptive effect of section 301 applies to causes of action arising in both contract and tort.”
 
 Thomas v. LTV Corp.,
 
 39 F.3d 611, 616 (5th Cir.1994). A state-law claim survives § 301 preemption when it is amenable to resolution without interpreting the collective bargaining agreement.
 
 Lingle
 
 486 U.S. at 409-10, 108 S.Ct. at 1883-84.
 

 The Fifth Circuit recently applied § 301 to preempt state-law claims brought by NFL players. In
 
 Smith
 
 two players who suffered football-related injuries during preseason training sued the Houston Oilers and members of its staff, alleging state-law claims of coercion, duress, extortion, assault and battery, and intentional infliction of emotional distress.
 
 Smith,
 
 87 F.3d at 719. During player cuts the Oilers sought to release them. The applicable collective bargaining agreement prohibited a club from terminating injured players, so the Oilers offered to settle the players’ contracts if they left voluntarily. The players contended that after they refused this offer, the Oilers engaged in behavior designed to coerce them into leaving the team, including imposing severe abuse in a contrived rehabilitation program, reducing rehabilitation treatment, depriving them of sleep, requiring strenuous exercise, making veiled threats of dismissal, intentionally confusing them regarding their schedules, and threatening to destroy their chances of playing for other NFL teams.
 
 Id.
 
 at 718-19.
 

 The district court held the state-law claims based on the abusive rehabilitation program were preempted by § 301 because their resolution would require analysis of the CBA, and dismissed the claims.
 
 Id.
 
 at 719. The court concluded that the claim for intentional infliction of emotional distress based on alleged blackballing threats “could not possibly be sanctioned by any labor contract.” It therefore remanded the claim to state court.
 
 Id.
 

 The Fifth Circuit affirmed the dismissal of the causes of action that the district court had held were preempted.
 
 Id.
 
 at 719-21. The panel reversed the district court’s failure to find that the claim for intentional infliction
 
 *527
 
 of emotional distress was similarly preempted.
 

 Here, however, the alleged misconduct cannot be separated from the underlying dispute between the players and the Oilers over the adequacy of the Oilers’ offer of termination pay. That dispute is fundamentally a labor dispute; indeed, the abuse complained-of by the players occurred only because they wanted to remain with a team that did not want them---[T]he abuse of the two players resulted from their compelled participation in an ostensible rehabilitation program under threats of termination or blackballing. The players could have avoided the abuse by refusing to participate. In sum, the complained of conduct was the Oilers’ unreasonable negotiating position regarding termination, not any infliction of violence upon the two players---- [B]ecause we are persuaded that the underlying labor dispute over termination pay cannot be divorced from the Oilers’ conduct in forcing the players to choose between the terms of termination and an excessively demanding rehabilitation program, we conclude that resolution of the playersf] claims in this case of professional athletes is too dependent on an analysis of the CBA to escape § 301 preemption.
 

 Id.
 
 at 720-21.
 

 C
 

 It is pellucid that the underlying labor dispute concerning the propriety of Holmes’ enrollment in the Drug Program cannot be separated from his claims that the Lions and defendants intentionally and fraudulently induced him to provide a urine sample, and, by such fraudulent conduct, intentionally inflicted emotional distress upon him, breached an implied covenant of good faith and fair dealing, and invaded his privacy. “To determine if adjudicating [a] claim requires interpreting the terms of the CBA, a court is required first to analyze the elements of the tort at issue.”
 
 Richter v. Merchants Fast Motor Lines, Inc.,
 
 83 F.3d 96, 97 (5th Cir.1996) (per curiam). The touchstone of each of Holmes’ state-law tort claims is that he was misled into submitting to the Lions test. To resolve these claims the court must perforce analyze the CBA and the collectively-bargained Drug Program to ascertain whether the Lions defrauded Holmes, or instead had the right to request that he submit to a pre-employment drug test.
 

 That Holmes’ claims are inextricably intertwined with, and substantially dependent upon, the terms of the Drug Program is amply evidenced by the arguments that Holmes made at the grievance hearing, and in documents that he submitted to the Commissioner in support of his appeal.
 

 In a letter to the Commissioner requesting postponement of the hearing and protesting the absence of documents relevant to Holmes’ entry into the Drug Program, Holmes’ counsel sought several categories of documents, including:
 

 NFL policies pertaining to the testing of athletes taking part in free agent tryouts.
 
 Are teams permitted to test such athletes? How widely are the results of such tests shared? What rights does an athlete have to challenge such tests? Can such tests be used as the basis for an athlete being required to enter Stage 1 of the Program?
 

 Grady C. Irvin, Jr., Esq. Oct. 17,1995 Ltr. to Commissioner Tagliabue at 2 (emphasis in original).
 

 During the hearing, Holmes contested the Lions’ right to test him under the collectively-bargained Drug Program. His counsel argued that the Commissioner should interpret the Drug Program to have precluded the Lions from conducting a pre-employment test, because Holmes was still under contract to the Cowboys, and § E(l)(a) of the Drug Program only permits a pre-employment test to be administered to a free agent player who is not under contract to an NFL club at the end of the preceding league year. His counsel stated:
 

 As you know, The Cowboys still had certain rights to Clayton Holmes at that particular time. He was called up to Detroit, and for some reason he was tested ... and he was tested at the request of The Detroit Lions. He had never been enrolled into the program before, never had a positive test before, but for some reason they tested him.
 
 Under the provisions of the pro
 
 
 *528
 

 gram and the program itself, he shouldn’t have [] been tested. I provide that to you because I think that it’s important.
 

 Hearing Tr. at 9 (emphasis added).
 

 Holmes reiterated this position in a post-hearing brief to the Commissioner:
 

 If your final determination is that [Holmes] (as a restricted free agent) was
 
 not
 
 under contract with the Dallas Cowboys at the end of the preceding year, and therefore, rightfully subject to being tested by the Detroit Lions, the tentacles of such a ruling would be far-reaching, of great public importance, and in the instant case evidence
 
 negligence
 
 (tort[i]ous conduct which has resulted in economic damage to [Holmes]) and/or a breach of confidentiality on the part of the NFL’s medical advis- or in providing drug test results to the Dallas Cowboys — at a time when [Holmes] was in the midst of contract negotiations with the Cowboys and some 50 days
 
 prior
 
 to [Holmes’] signing a 1995 NFL Player Contract with the club. In essence, you would be concluding that
 
 every
 
 restricted free agent in the final year of his contract is subject to being tested for drugs and alcohol use (even in the absence of probable cause), and that such information can be provided by the NFL to that player’s former club and essentially used as leverage by the club in contract talks.
 

 Oct. 31, 1995 Ltr.Br. to Commissioner at [5] (emphasis in original) (footnotes omitted).
 

 Significantly, Holmes then relied on his attack on the Lions test — which triggered his entry into the Drug Program — to support a broader challenge to all the adverse consequences that flowed from subsequent positive tests in July and August 1995:
 

 [Holmes] was unlawfully tested and enrolled into the NFL’s drug rehabilitation program---- The testing of [Holmes] was unlawful; the drug test was not administered in accordance with the National Football League Policy and Program for Drugs of Abuse and Alcohol (“Policy”). Therefore, the positive results of the Detroit Lions drug test and the chain-reaction which followed (e.g., enrollment into the drug treatment program, subsequent testing, etc.) are all fruits of a poisonous tree.
 

 Id.
 
 at [3].
 

 Based on the positions Holmes took during his appeal, it is impossible to justify his present contention that resolution of his state-law claims is not substantially dependent upon an analysis of the collectively-bargained Drug Program. It simply cannot be determined whether the Lions test was the result of fraud — which is the linchpin of all his state-law claims — unless it is first resolved whether the Drug Program allowed the Lions to solicit and conduct the March 9, 1995 test.
 

 Accordingly, the court holds that Holmes’ state-law claims are all preempted.
 

 * * * * *
 

 Defendants’ motion to dismiss is granted, and this action is dismissed by judgment filed today.
 

 SO ORDERED.
 

 [1]
 

 . Holmes applied for a preliminary injunction in which he asked
 
 inter alia
 
 that the court restrain defendants from subjecting him to disciplinary action. The court denied the injunction application without opinion on January 25, 1996 in order to decide it prior to commencement of the Super Bowl. The court indicated that an opinion in support of its ruling would follow in due course. Because Holmes did not appeal the court's decision, and in view of the judgment dismissing this case today, no opinion with re
 
 *520
 
 spect to Holmes' preliminary injunction application will be filed.
 

 [2]
 

 . The court's recitation of the facts is based on the allegations of Holmes' amended complaint, as well as on documents that Holmes attached to the amended complaint, or that the parties submitted to the court as exhibits to other pleadings. "[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.”
 
 Branch v. Tunnell,
 
 14 F.3d 449, 454 (9th Cir.),
 
 cert. denied,
 
 -U.S.-, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994);
 
 see also Venture Assocs. Corp. v. Zenith Data Sys. Corp.,
 
 987 F.2d 429, 431-32 (7th Cir. 1993) (holding motion to dismiss proper where defendant attached to motion document referred to in complaint, and that constituted core of parties' contractual relationship); 5A Charles A. Wright & Arthur R. Miller,
 
 Federal Practice and Procedure
 
 § 1357 at 299 (2d ed. 1990) (items appearing in the record may be taken into account in deciding Rule 12(b)(6) motion). Holmes does not challenge the authenticity of the documents on which the court relies.
 

 [3]
 

 . Holmes subsequently tested positive for drug use in October 1995 while in Stage 3, and as a result was banished from the NFL for at least one calendar year on November 3, 1995.
 

 [4]
 

 . Section N:
 

 
 *521
 
 Appeal Rights
 

 Any player who is notified by the League Office that he is subject to discipline for a violation of the terms of this Program is entitled to appeal to the Commissioner. In all such appeals, the procedures and other provisions of Article XI (Commissioner Discipline) of the 1993 CBA shall be applicable to the extent they are not specifically superseded by the provisions of this Section N.
 

 A player desiring to appeal must do so in writing within five (5) days of receiving notice from the League Office that he is subject to discipline.
 

 In his appeal, the player may not challenge any prior determination that was not timely appealed in its immediate aftermath, nor reopen any prior determination made after being timely appealed.
 

 The Commissioner will designate a time and place for a hearing, at which either he or his designee will preside. A player may be accompanied by counsel and may present relevant evidence or testimony in support of his appeal. Following the hearing, the Commissioner will issue a written decision, which will constitute a full, final, and complete disposition of the appeal and which will be binding on aft parties. Pending completion of this appeal, the suspension or other discipline imposed will not take effect.
 

 [5]
 

 . The hearing was initially set for September 28, 1995 and was rescheduled due to a scheduling conflict involving Holmes’ counsel.
 

 [6]
 

 . Although Holmes’ first amended complaint also alleges that defendants breached the CBA under "federal
 
 and Texas
 
 law,” Am.Compl. at ¶ 11(17) (emphasis added), the court need not address the Texas-law claim specifically. Holmes does not appear to read his amended complaint to allege such a claim.
 
 See
 
 P.Mem. at 5 (listing state-law claims alleged in amended complaint, but not designating a Texas- or state-law breach of contract claim) & 5 n. 4 (stating that he "also asserts a
 
 federal
 
 cause of action for breach of contract” (emphasis added)). In any event, the claim for Texas-law breach of contract is preempted for the same reasons as are plaintiff's other state-law claims.
 

 [7]
 

 . Defendants’ motion to dismiss pre-dates the filing of plaintiff’s first amended complaint. Although Holmes' amended complaint supersedes his original complaint,
 
 Datastorm Technologies, Inc. v. Excalibur Communications, Inc.,
 
 888 F.Supp. 112, 114 (N.D.Cal.1995), the court may nevertheless treat defendants’ motion as directed to the amended complaint because the defects in Holmes' complaint reappear in the amended complaint.
 
 Id.
 
 (treating motion to dismiss as directed to subsequent complaint because defects remained);
 
 see Patton Elec. Co. v. Rampart Air, Inc.,
 
 777 F.Supp. 704, 713 (N.D.Ind.1991) ("If some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading.”) (quoting 6 Charles A. Wright, et al.,
 
 Federal Practice and Procedure
 
 § 1476 at 556-58 (2d ed. 1990)) (addressing necessity for defendants to file responsive pleading to amended complaint). Moreover, Holmes neither contends that the court should require that defendants move for dismissed anew, nor that he will suffer prejudice from the use of this procedure. Accordingly, the court will decide defendants’ motion to dismiss based on Holmes’ first amended complaint.
 

 [8]
 

 . Defendants also move for Rule 11 sanctions. The court will decide that motion separately.
 

 [9]
 

 . For the purpose of determining futility, the court relies on the record evidence that the parties have submitted for the court’s consideration in connection with other pending motions.
 
 See supra
 
 at n. 2.